FILED
07/07/2025
Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
March 11, 2025 Session

**STATE OF TENNESSEE v. BRANDON BASSETT**

**Appeal from the Circuit Court for Montgomery County**
**No. 63CC1-2022-CR-366  Robert Bateman, Judge**

_____

**No. M2024-00246-CCA-R3-CD**

_____

Brandon Bassett, Defendant, was indicted for and convicted of five counts of aggravated sexual battery. On appeal he argues that the State's failure to elect an offense in Count 5 resulted in a jury verdict that was not unanimous and requires reversal. Defendant also argues the trial court abused its discretion in ordering consecutive sentencing by failing to place findings on the record to show that the overall length of the sentence comported with the purposes and principles of sentencing. Because we determine that the proof at trial necessitated an election on Count 5, we reverse the conviction in Count 5 and remand for a new trial. However, we determine the trial court did not abuse its discretion in sentencing Defendant to an effective sentence of thirty years. In all other respects, the judgments are affirmed. Accordingly, the judgments of the trial court are affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed in**
**Part, Reversed in Part, and Remanded**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN, P.J., and JEFFREY USMAN, Sp. J., joined.

Kendall Stivers Jones, Assistant Public Defender – Appellate Division Tennessee District Public Defenders Conference, Franklin, Tennessee (on appeal); Roger Nell, District Public Defender (at trial); John T. Maher (at bond hearing); Charles Bloodworth and Joseph A. Price, Assistant District Public Defenders (at pre-trial motions and motion for new trial), for the appellant, Brandon Bassett.

Jonathan Skrmetti, Attorney General and Reporter; Caroline Weldon, Assistant Attorney General; Robert Nash, District Attorney General; and Marianne Bell, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

Defendant was indicted by the Montgomery County Grand Jury in October of 2021 for five counts of aggravated sexual battery with a victim under thirteen years of age, A.R.[1] Count 1 corresponded to an incident occurring on October 1, 2020, Count 2 corresponded to an incident occurring on October 8, 2020, Count 3 corresponded with an incident occurring on October 9, 2020, Count 4 corresponded to an incident occurring on October 28, 2020, and Count 5 corresponded to an incident occurring on November 25, 2020.

A.R. testified at trial that she was born in July of 2009. She was fourteen at the time of the trial and in the ninth grade. She lived with her mother and her younger brother. She testified that she had two other siblings, a brother and a sister, who lived with "their dad." A.R. identified Defendant as her mother's former fiancé. She lived with Defendant when her mother and Defendant were dating and engaged, starting when she was in the fifth grade.

A.R. explained that Defendant also had children. They only stayed with Defendant on holidays and over the summer. They were younger than her. She "[m]ainly got along with" Defendant but did not call him Dad. A.R.'s mother became pregnant with Defendant's child in the spring of 2020.

In the fall of 2020, during the Covid-19 pandemic, A.R. did not attend school. At the time, she should have been in sixth grade and was eleven years old. A.R. recalled the first time something happened to her "in her room." It happened on October 1, "[i]n the morning" while she was "[l]aying down on [her] bed." This date was significant to the victim because it was her mother's birthday and the day her mother became engaged to Defendant. The victim recalled she was on the bottom bunk and described herself as "[b]oth" asleep and awake. Defendant "was coming in [her] room to say goodbye to [her], and his leg was like kind of up on the bed, . . . so he could, like, lean over. He was trying to wake [her] up so he could say goodbye, . . . ." A.R. could not remember what she was wearing. She thought just a "t-shirt and pants or shorts" but was "not really sure." She could not remember if "this was the time where he put his hand in [her] shirt." She was "not sure," but she thought "it was." His hand went "[t]owards [her] breast." She could not "really remember" if he touched her skin. She remembered that she "moved herself so his hand wouldn't be there" by turning "over to [her] side." Defendant's actions made her feel "uncomfortable." She documented the incident in the notes application on her phone

---

[1] It is the policy of this Court to refer to minor victims of sexual abuse by their initials in order to protect their identity.

so she "didn't forget that it happened." She did not tell her mom about the incident because she was "scared of what [Defendant] was going to do if [she] did."

When asked how many times this happened between October 1 and November 25, A.R. responded that she did not remember. A.R. testified Defendant touched her "breast" and "[b]etween October 1st and November 25th," Defendant touched "[b]elow her stomach" where there was hair. Defendant touched her in the morning and at "[o]ther times in the day," specifically referring to one time when Defendant hugged her and touched her on the side of her breast over her clothing.

A.R. testified that she "documented" all these incidents in a note on her phone when she could, but that she did not document "every time." Counsel for the State presented A.R. with printouts of her notes from her phone. A.R. testified that she could remember what happened on October 1, but could not remember all the other dates without looking at her phone. A.R. read the note on her phone from October 8 aloud to the jury as follows:

> He rubbed my bottom and on my belly, I was awake and pushed his hand away. I don't feel comfortable around him. That is also why I wanted to come and get pizza with you and not stay home. I don't like to be alone with him because I'm not sure what he can do. I'm really scared and I'm sorry. I'm just telling you this. I tell [sic] him to stop. He does it every morning and every night. [C.] saw it and she even told me.

On October 9, the victim wrote a note on her phone at 5:40 a.m. The victim wrote that Defendant "rubbed [her] bottom again." The victim wrote that she was "really uncomfortable when he felt [her] ribs" and Defendant "was rubbing near [her] private." The victim continued that she "[does not] like it when he touches me. [She does not] like it and [Defendant] knows [she] really [does not] like it because [she] has told him to stop." Defendant rubbed her "private" area "over" top of her clothes. As the victim testified, she admitted that she never actually told Defendant to stop but she would "move his hand away hoping that he would" stop.

The victim did not remember the next date Defendant touched her without looking at her notes on her phone. The next note was made on October 28, 2020, at 5:15 a.m. On this date, Defendant rubbed her "private" and "squeezed" her breast. She "pushed" his hand away and turned over to go back to sleep. Defendant said, "this is getting f[***]ing annoying."

The victim's younger brother was born on November 12, 2020. The baby had to stay in the hospital for a week because he had an issue with his kidneys.

- 3 -

The last time something happened with Defendant was on November 25, 2020. A.R. was "[l]aying in bed" when Defendant "touched [her]." A.R. could not "remember where he [touched her], but [she] knew that [he] did." The State started to refresh the victim's memory with respect to November 25, but counsel for Defendant and the trial court commented that the victim had already testified as to what happened on that date.

Later, on cross-examination, trial counsel asked the victim to describe the November 25 incident. Trial counsel asked, "And then on November 25, you wrote on here, he touches my breast while hugging me and I hate it. When he is hugging you and touching your breasts, is he doing it from behind, so his hands are coming around in front of you?" The victim answered, "No." She explained that it was "[l]ike, we were going in for a hug, and that's when it happened." Later, the victim said she did not "remember how it all played out, [she] just kn[ew] how he did it."

On November 26, the victim sent screenshots of all her notes on her cell phone to the niece of her mother's friend. The friend alerted the victim's mother, who came into the victim's bedroom and "grabbed" her cell phone. When the victim's mother read the notes, she confronted Defendant. At first, Defendant asked her what she was talking about and then when asked if he did the things the victim described in the notes, he claimed that he "could have" but that he did not "remember." The victim's mother remembered that Defendant was "pretty quiet." The victim's mother asked Defendant how his "hand just accidentally slip[ped] down [her] daughter's pants" and Defendant responded that he did not know. The victim's mother removed her engagement ring and told Defendant she did not want to marry him.

The victim's mother was on maternity leave with a newborn at the time. She was out of work and could not get the children out of the house, so they continued to live with Defendant. The victim's mother told Defendant he was not allowed to be alone with the children.

The victim's mother testified that she received Facebook messages from Defendant on June 27, 2021, while the victim was out of town. The conversation went as follows:

> [Defendant]: Trying to understand it and explain things to you and lately it hasn[']t been bad with her not at home idk it[']s not that [I']m not attracted to you or anything it[']s really just something I simply can not even explain. And yea I know [I']ve been bad with wanting you especially lately but idk what else to do with the urge or thoughts of everything. And yea idk how to even explain this [to] you in person let alone with the kids all being home believe me [I] hate myself more than you or her hate me . . .

[The victim's mother]: You need to stop[.]   Period[.]

[Defendant]: What?

[The victim's mother]: I seriously just want to punch you!   Jus[t] for the simple fact you already tried to have your way with my daughter.   And honestly I feel even more sick to my stomach!   I can[']t even have my daughter home after you just said that to me.   You are seriously making me feel so uncomfortable around you.   I can[']t. . . .   I'm at the point where your kids need to leave and I need to get the f[***] out[.]

[Defendant]: See exactly [I] can[']t even explain nothing to you.   Not even how I meant it either f[***.]   How exactly would [I] even be able to be like [I] am having these thoughts in my head that [I] can not f[***]ing control [I] don[']t f[***]ing know why [I] don[']t get it.   Like oh hey babe btw [I] have these thoughts about [the victim] or whatever else and [I] don[']t get why idk what the hell is wrong with me [I] don[']t understand it.   When in the back of my head [I']m going to come to you and tell you this and you[']ll tell me to f[***] off and you pack up and leave like f[***] [I']m just a pos and shouldn[']t be here anymore.   My mind doesn[']t go to oh she'll be understanding and stay no it goes to well [I] say anything she will just pack up and leave so [I] try and deal with it myself regardless you leave anywa[y].

In June of 2021, an incident took place at Defendant's home.  The victim's mother called the police, and the call prompted an investigation by the Department of Children's Services.  The victim, her mother, and the other children moved out of Defendant's home.  The investigation led to the forensic interview of the victim in July of 2021.

During the victim's testimony at trial, she explained that something happened in July of 2021 that led to her going to talk to someone at the Department of Children's Services.  The victim recalled her forensic interview in which she "told [an interviewer] all the things that [Defendant] did."  The victim testified that she told the truth during the interview.  The State played the forensic interview for the jury.  The interview took place on July 22, 2021.  In the video, the victim was interviewed by Karissa Cunningham.[2]  The victim expressed her "anxiety" about the interview in part because her mother was upset that she had to miss work.  The victim told Ms. Cunningham she likes to "draw" and "paint."  The victim explained that she will be in seventh grade when school starts.  The

---

[2] Ms. Cunningham clarified at trial that some of the reports in the record contained her married name of Chapman.  After her divorce in 2021, she returned to using her maiden name of Cunningham.  As such, we will refer to her by Cunningham.

victim described last year as hard because school was "virtual." The victim explained that her younger brother, who is nine, has autism, and a "lot going on." She finds his behavior "annoying" but acknowledged that he "can't really stop it." The victim told Ms. Cunningham she has "ADHD." The victim has a younger sister who is five and a little brother who is eight months. The victim also explained that she had two other siblings, ages five and four who live in another state. The victim does not always count them as siblings because she does not see them very often.

When asked about what happened to initiate the forensic interview, the victim explained that Defendant would put his hand up her shirt and down her "lower half" and that he would "tickle [her]" on her "lower half." The victim described it as "uncomfortable" and explained that these encounters would happen in the morning when Defendant woke and gave her a hug before he went to work. Defendant touched her skin. The victim generally wore tank tops to bed but acknowledged that sometimes her shirt rode up, exposing part of her stomach. Defendant touched her breasts, and it made her feel uncomfortable. When she "push[ed] his hand away[,]" Defendant got annoyed. He touched her "private" more than one time. The victim was asleep, and Defendant said his hand "slipped." She was "scared" to tell her mom. The victim remembered that Defendant used his hand to touch her private but could not remember if it was on top of her clothes or on her skin. The victim told Ms. Cunningham Defendant came to her room almost every morning but that she did not really remember how many times. The victim explained Defendant also touched her when he gave her a hug. The victim explained that no one else ever saw Defendant touch her. Defendant's hand went in her pants when he touched her privates, and he touched on the inside of her underwear. The victim remembered that she was sleeping on her side using her mom's pregnancy pillow. Defendant moved his hands on her body, but nothing went inside her privates.

The victim explained to Ms. Cunningham that she had the "dates saved in her phone" in the "notes" each time Defendant touched her. At first, the victim said that it happened "one time" but then claimed it happened "frequently for a month" last year in "October or November." The last time Defendant touched her was November 25. When Defendant hugged her, he kept his hands on the sides of her breasts, instead of wrapping them around her body.

On the video, the victim unzipped her purse and took her cell phone out of her bag. She read to Ms. Cunningham from some of the notes. The victim flipped her cell phone over. Then she told Ms. Cunningham that Defendant would "touch her down there" in the area that she referred to as her "privates." The victim told Ms. Cunningham that Defendant touched her privates with his fingers more than one time and that he touched her in the morning or when he was giving her a hug. The victim said she would "normally" type a note any time Defendant touched her.

Defendant testified that he served in the military and attended technical school before he started work as a mechanic. He and the victim's mother started dating in 2019. He proposed to the victim's mother on her birthday in 2020. The victim gave her blessing for the marriage. The victim's mother was eight months pregnant with Defendant's child at the time he proposed.

Defendant denied that the living arrangements changed after the victim's mother confronted him about the allegations. Defendant testified that the victim's mother still slept with him in the bed but would occasionally sleep on the couch. Defendant also claimed that he and the victim's mother continued to have a sexual relationship after the allegations and until the victim's mother and children moved out of the house. Defendant also insisted that he continued to spend time with the children after the allegations, including the victim. Even after the victim's mother moved out with the children, Defendant claimed that he visited them at their new house, even spending Christmas 2021 together.

Defendant acknowledged that he exchanged Facebook messages with the victim's mother after the victim made her accusations. He explained that in the messages he referred to feelings of PTSD, anxiety, and depression. Defendant denied that he visited the victim in her bedroom before he went to work in the mornings. Defendant claimed the victim was "just telling a story" because she wanted to be the center of attention.

At the conclusion of the proof, the trial court reviewed the proposed jury instructions with counsel for both parties. Counsel for the State specifically asked if they "need[] to elect any specific acts?" The trial court observed that the offenses charged involved specific dates, rather than a date range. Counsel for the State agreed but wanted to clarify because the proof at trial for Count Four, dealing with October 28 was that Defendant "rubbed her private and squeezed her breast[.]" Counsel for Defendant, when asked if the State was required to elect on Count 4, replied, "I don't believe so." The State elected the act of "rubbing [the victim's] private" for Count Four. The prosecutor said he did not think there were any election issues with the other counts. There was no objection by counsel for Defendant.

The trial court charged the jury, specifying that the State elected on Count 4 the proof that Defendant "rub[bed] the alleged victim's . . . private . . . occurring on October 28, 2020." During closing arguments, the State recounted the proof for each offense, specifically stating the following with respect to Count 5, "And then, finally on November 25th of 2020, the Defendant touched her lower stomach on the area where she has hair. [A.R.] testified to all of those things on direct examination." On rebuttal, counsel for the State stated the following with respect to Count 5:

Regarding the note on November 25th and he attempted a hug, she explained that on the stand. She said I have my hands here (indicating) and he went in for the hug and touched the side of my breast. And she also testified that he touched her lower-stomach part where she had hair on the same day. And that was the last time it happened.

The jury convicted Defendant as charged on all counts. At the sentencing hearing, the trial court sentenced Defendant to ten years for each count of aggravated sexual battery, running Counts 2 and 3 consecutively to Count 1 and Counts 4 and 5 concurrently to Count 3, for an effective sentence of thirty years in the Tennessee Department of Correction. The trial court also ordered Defendant to register as a sex offender for life and remain on community supervision once he was released from prison. Defendant filed a timely motion for new trial in which he raised issues about the racial makeup of the jury panel, the record of voir dire, the sufficiency of the evidence, the introduction of the notes from the victim's phone into evidence, the introduction of text messages from the victim to her mother, the failure to allow Defendant to inspect the victim's phone, and the trial court's decision to order consecutive sentencing.

Defendant appeals.

## *Analysis*

### *Count 5 Election*

Defendant argues on appeal that he was denied the right to a unanimous jury verdict because the State failed to make a proper election in Count 5. Specifically, Defendant insists that the proof was not "straightforward" with respect to what happened on November 25, 2020. He insists that the victim testified that Defendant touched her "[b]elow her stomach" in an area where there was hair, but that she did not specifically state that this occurred on November 25. Moreover, when the victim was questioned about the note in her phone about November 25, she acknowledged that she wrote "he touches my breast while hugging me and I hate it." Then, in her forensic interview, the victim read from the note on November 25, and told the interviewer that Defendant touched her "like when you're going for a hug . . . his hand would stay right here where my breasts are." This testimony, according to Defendant, established two separate unlawful sexual contacts on November 25 for which the State should have been required to elect. Defendant acknowledges that he failed to raise this issue in a motion for new trial and now, on appeal, can only get relief via plain error. The State, on the other hand, argues that Defendant is not entitled to plain error review because he "cannot establish that the absence of an election in [C]ount [5] of the indictment breached a clear and unequivocal rule of law."

Specifically, the State argues that "[d]espite Defendant's insistence to the contrary, [the victim] never said that [Defendant] touched the area beneath her stomach on November 25, 2020."

In criminal cases, the doctrine of plain error permits appellate courts to consider issues that were not raised in the trial court. Tennessee Rule of Appellate Procedure 36(b), the plain error doctrine, states in part that "[w]hen necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal." It is well-settled that the discretionary authority to invoke the plain error doctrine should be "sparingly exercised," *State v. Bledsoe*, 226 S.W.3d 349, 354 (Tenn. 2007), because "appellate courts do not sit as self-directed boards of legal inquiry and research, but essentially as arbitrators of legal questions presented and argued by the parties before them." *State v. Northern*, 262 S.W.3d 741, 766 (Tenn. 2008) (Holder, J., concurring and dissenting) (quoting *Carducci v. Regan*, 714 F.2d 171, 177 (D.C. Cir. 1983)).

To determine whether a trial error rises to the level of justifying "plain error" review, we look to the following five factors:

> (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is "necessary to do substantial justice."

*State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). All five factors must be established by the record before this Court will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established. *State v. Bishop*, 431 S.W.3d 22, 44 (Tenn. 2014). Even if all five factors are present, "the plain error must be of such a great magnitude that it probably changed the outcome of the trial." *Id.* (quoting *Adkisson*, 899 S.W.2d at 642).

Looking to the first factor, the record in this case clearly establishes what happened in the trial court. The record includes the recording of the victim's forensic interview, the transcript of the trial, the discussion between counsel and the trial court regarding election, the closing arguments, and the jury instructions.

The second factor involves a determination as to whether a clear and unequivocal rule of law was breached. *Smith*, 24 S.W.3d 282. The Tennessee Constitution provides that criminal defendants have a fundamental right to a unanimous jury verdict on the

charges against them. *State v. Rickman*, 876 S.W.2d 824, 828 (Tenn. 1994) (citing Tenn. Const. art. I, § 6); *see also State v. Shelton*, 851 S.W.2d 134, 137 (Tenn. 1993) ("Although the federal constitution's requirement of unanimity among jurors has not been imposed on the states through the Fourteenth Amendment, there should be no question that the unanimity of twelve jurors is required in criminal cases under our state constitution."). This guarantee is usually satisfied due to the "general rule that evidence the defendant has committed some other crime wholly independent of that for which he is charged, even though it is a crime of the same character[,] is generally excluded as irrelevant." *State v. Qualls*, 482 S.W.3d 1, 9 (Tenn. 2016) (internal quotation marks omitted) (citing *Rickman*, 876 S.W.2d at 827; Tenn. R. Evid. 404(a), (b)). However, when the State presents "proof of multiple instances of conduct that each match the allegations contained in a single charged count, the State, at the close of its case-in-chief, must elect the distinct conduct about which the jury is to deliberate in returning its verdict on the relevant count." *Smith*, 492 S.W.3d at 232-33 (collecting cases).

In cases where the State prosecutes sexual crimes committed against children, election issues often arise, especially when the defendant is charged with committing the offenses over a long period of time and the young victim is "unable to identify the exact date on which any one act was perpetrated." *State v. Johnson*, 53 S.W.3d 628, 631 (Tenn. 2001) (collecting cases). In cases where an indictment charges that such crimes occurred in a "general time frame[] that encompass[es] several months[,]" "the State may introduce evidence of sex crimes allegedly committed against the victim during the time frame charged in the indictment, but, at the close of the proof, the State must elect the facts upon which it is relying for conviction." *Id.* (citing *Rickman*, 876 S.W.2d at 829); *see also Shelton*, 851 S.W.2d at 137 ("A defendant's right to a unanimous jury before conviction requires the trial court to take precautions to ensure that the jury deliberates over the particular charged offense, instead of creating a patchwork verdict based on different offenses in evidence.") (internal quotation marks omitted) (citing *State v. Brown*, 823 S.W.2d 576, 583 (Tenn. Crim. App. 1991)). On the other hand, if the State can pinpoint a specific event that occurred during the time period found in the indictment, and the victim can testify to that specific event, then the *Rickman* exception, or relaxation of the rules, does not apply. *State v. Smith*, No. E2012-02587-CCA-R3-CD, 2014 WL 3940134, at *13 (Tenn. Crim. App. Aug. 13, 2014), *no perm. app. filed*.

The State may elect an offense in a variety of ways, such as by eliciting testimony from the victim which narrows the offense to a specific month, identifies a particular type of offense, or else associates the date of the offense to a meaningful or specific event in the victim's life. *Qualls*, 482 S.W.3d at 10-11 (citing *State v. Walton*, 958 S.W.2d 724, 727 (Tenn. 1997); *Shelton*, 851 S.W.2d at 138; *State v. Herron*, 461 S.W.3d 890, 904 (Tenn. 2015); *State v. Brown*, 992 S.W.2d 389, 392 (Tenn. 1991); *Tidwell v. State*, 922 S.W.2d 497, 499 (Tenn. 1996)). When the State presents this specific evidence of "distinguishable

criminal acts," then it "must elect the specific act for which it seeks conviction in a manner that identifies the prosecuted offense for the jury." *Qualls*, 482 S.W.3d at 16 (citing *Shelton*, 851 S.W.2d at 138). However, in cases involving generic evidence, such as when a victim describes multiple instances of similar acts of abuse occurring over a long period of time but is unable to differentiate the offenses or otherwise relate them to a specific date or life event, the criminal defendant's right to a unanimous jury verdict is protected via the trial court's providing a modified unanimity instruction.[3] *Qualls*, 482 S.W.3d at 17.

This case is somewhat unique in that the victim was able to provide not a general time frame, but exact dates on which the incidents occurred with notes on her phone. If the testimony as to the events of those dates included a description of more than one incident, the State was required to make an election. The victim testified that "[b]etween October 1st and November 25th ," Defendant touched "[b]elow her stomach" where there was hair. She also testified on cross-examination that she wrote in her phone "[Defendant] touches my breast while hugging me and I hate it." Defendant acted "[l]ike, we were going in for a hug, and that's when it happened." Later, the victim said she did not "remember how it all played out, [she] just kn[ew] how he did it." During closing arguments, counsel for the State commented that the victim testified that on November 25th 2020, the Defendant touched her lower stomach "on the area where she has hair." On rebuttal, counsel for the State stated the following with respect to Count 5:

> Regarding the note on November 25th and he attempted a hug, she explained that on the stand. She said I have my hands here (indicating) and he went in for the hug and touched the side of my breast. And she also testified that he touched her lower-stomach part where she had hair on the same day. And that was the last time it happened.

Thus, the State presented proof of two specific instances of touching on November 25 upon which the jury could have rendered a verdict of guilty on a charge of aggravated sexual battery: touching of the victim's breasts while hugging her and touching of the area where there was hair while the victim was in bed. The State maintains that no election was required because the victim testified that Defendant touched her breasts on November 25 "then offered more generalized facts about what transpired during that two month period." In other words, according to the State, because she "identified only the touching of her breasts on November 25" when looking at the testimony at trial and the forensic interview, there was no election required and Defendant cannot establish the breach of a clear and unequivocal rule of law. We disagree. As detailed above, the ambiguity surrounding the

---

[3] This modified unanimity instruction requires that in generic evidence cases, the trial court must inform the jury that it "must unanimously agree that the State has proven beyond a reasonable doubt the commission of all of the acts described by the alleged victim" occurring within the timeframe charged in the indictment. *Qualls*, 482 S.W.3d at 17; *see also* 7 Tenn. Prac. Pattern Jury Instr. T.P.I.—Crim. 42.25(a).

victim's description of the November 25 incident, in our view, necessitated the need for a specific election of an offense for Count 5.

Because we conclude that an election was required for Count 5, we must now consider whether there was an election and if it was sufficient. The indictment charged Defendant with an aggravated sexual battery on November 25, 2020. The closing argument and rebuttal argument of the State clearly referenced two events on November 25 – the touching of the victim's breast and the "lower-stomach part where she had hair on the same day." While we acknowledge that the argument of counsel is not evidence, *State v. Shaw*, 37 S.W.3d 900, 904 (Tenn. 2001), the closing argument and rebuttal argument of the State hardly amounted to an election such that it satisfied to protect the Defendant's right to a unanimous jury verdict. *See Brown*, 992 S.W.2d at 392 (finding the State's election insufficient where it "simply narrowed the time-frame of the charged offense from the period alleged in the indictment" rather than attempting to "clarify the victim's testimony, or clarify the conflicts in the testimony."). Here, in Count 5, Defendant was charged with one count of aggravated sexual battery occurring on November 25. The proof in the record indicated that two touchings happened on that date and the State failed to elect a specific instance it intended the jury to consider during deliberation. Thus, a clear and unequivocal rule of law was breached.

The third requirement for plain error review is whether one of Defendant's substantial rights was adversely affected by the breach of the clear and unequivocal rule of law. *Smith*, 24 S.W.3d 282. Election errors are non-structural constitutional errors. *Smith*, 492 S.W.3d at 236 (citing *Qualls*, 482 S.W.3d at 18-20; *State v. Rodriguez*, 254 S.W.3d 361, 371 (Tenn. 2008)). Non-structural constitutional errors are subject to a harmless error analysis which "requires reversal unless the State demonstrates beyond a reasonable doubt that the error is harmless" and did not contribute to the verdict obtained. *Rodriguez*, 254 S.W.3d at 371.

Even though we have concluded the State's failure to make an election was error, we must decide if that error was harmless in order to determine if one of Defendant's substantial rights was adversely affected by the breach of the clear and unequivocal rule of law. In *Qualls*, the Tennessee Supreme Court concluded that any error in the State's failure to make an election in a generic evidence case was harmless because "the record on appeal demonstrate[d] beyond a reasonable doubt that by convicting the defendant, the jury expressed its unanimous conclusion that the victims were credible and that the defendant committed all the acts described by the victims." *Qualls*, 482 S.W.3d at 19. This Court can also review a prosecutor's statements during closing arguments to determine whether the State clarified its election by drawing the jury's attention to a specific incident to be considered during deliberations, though such statements are not, standing alone, dispositive

of harmless error. *Smith*, 492 S.W.3d at 237-38; *see also State v. Breeden*, No. E2019-00983-CCA-R3-CD, 2020 WL 5638589, at *11 (Tenn. Crim. App. Sept. 21, 2020).

Here, the proof at trial could lead the jury to conclude that two instances of aggravated sexual battery occurred on November 25. The trial court defined the offense during closing arguments and even instructed the jury as to election on Count 4. However, the trial court did not specify which act it intended the jury to consider for Count 5. The State did not remedy the failure to elect during closing arguments by drawing the jury's attention to a specific instance of conduct. *Smith*, 492 S.W.3d at 237-38; *Brown*, 992 S.W.2d at 392; *Breeden*, 2020 WL 5638589, at *11. If anything, the closing argument made clear that there were two instances from which the jury could convict Defendant on Count 5. To the extent that the State argues that any error was harmless because the victim's note on her phone specified that Defendant touched her breasts on November 25 and her testimony as to Defendant touching the area where she had hair referred generally to touching during the time period between October 1 and November 25, we disagree for the reasons noted above and because that argument was not presented to the jury to ensure each member based its verdict on the same instance of conduct. In other words, the State presented two specific instances of touching to the jury, which could have been attributed to the November 25 date. Accordingly, Defendant's right to a unanimous jury verdict was adversely affected, and the third requirement for plain error review is satisfied.

Next, there is no indication in the record to support a conclusion that Defendant waived this issue for tactical purposes. *Smith*, 492 S.W.3d at 238-39 ("This court has held that an absence of indicia in the trial record that a defendant has waived an issue for tactical reasons is sufficient to satisfy this criterion of plain error.") (citing *State v. Gomez*, 239 S.W.3d 733, 742 (Tenn. 2007)); *see also State v. Guin*, No. E2022-00391-CCA-R3-CD, 2023 WL 8675582, at *7 (Tenn. Crim. App. Dec. 15, 2023) ("[W]e can think of no tactical reason for the defendant to waive the State's obligation to elect offenses."), *perm. app. denied* (Tenn. May 16, 2024).

Lastly, consideration of this error is necessary to do substantial justice. The State erred by not specifically electing an offense in this case as it related to November 25, and the trial court's failure to require an election constituted plain error. Defendant's conviction for aggravated sexual battery in Count 5 must be reversed, and he is entitled to a new trial on that lone count.

*Sentencing*

Next, Defendant argues that the trial court abused its discretion when it ordered that three of the five convictions run consecutively for a total effective sentence of thirty years to be served at 100% because it failed to place any findings on the record to show that the

- 13 -

overall length of the sentence comported with the purposes and principles of sentencing. Defendant asks this Court to review the sentence de novo and enter a sentence reflecting concurrent sentences or to remand for a new sentencing hearing with instructions to place appropriate findings on the record to support the sentence imposed. The State, on the other hand, argues that the trial court did not abuse its discretion.

This Court reviews the length, range, and manner of service imposed by the trial court under an abuse of discretion standard with a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012). The trial court is granted broad discretion to impose a sentence anywhere within the applicable range and the sentencing decision of the trial court will be upheld "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id*. at 709-10. We, likewise, review the trial court's order of consecutive sentencing for abuse of discretion, with a presumption of reasonableness afforded to the trial court's decision. *See State v. Pollard*, 432 S.W.3d 851, 860 (Tenn. 2013) (applying the same deferential standard announced in *Bise*, 380 S.W.3d at 682, to the trial court's consecutive sentencing decisions).

In determining a defendant's sentence, the trial court is to consider the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors; (6) any statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the defendant in his own behalf about sentencing; and (8) the result of the validated risk and needs assessment conducted by the department and contained in the presentence report. *See* T.C.A. § 40-35-210(b); *see also Bise*, 380 S.W.3d at 697-98.

The record reflects that the trial court "considered the principles set forth in Tennessee Code [A]nnotated [sections] 40-35-102 and 103." The trial court also considered the evidence at trial and at the sentencing hearing, the presentence report, "arguments by counsel, nature and characteristics of the criminal conduct involved, evidence offered by the parties on both enhancement factors and mitigating factors," statistical evidence provided by the Administrative Office of the Courts, the statement made by Defendant, and the validated Needs and Risk Assessment. As a result, the court's determinations are afforded a presumption of reasonableness.

The trial court noted that Defendant was convicted of five counts of aggravated sexual battery and was a Range I, standard offender subject to a sentence between eight and twelve years for each count. The trial court noted that Defendant was required to be

on community supervision for life and the sex offender registry. The trial court applied enhancement factor (14), Defendant abused a position of public or private trust to facilitate commission of the offense. T.C.A. § 40-35-114(14). The trial court applied mitigating factor (8), that Defendant has a mental condition, PTSD, that could affect his culpability. T.C.A. §40-35-113(8). The trial court found that "considering all the relevant factors" it was appropriate to sentence Defendant at the "midpoint of the range" and imposed a sentence of ten years on each of the five counts.

As to consecutive sentencing, Tennessee Code Annotated section 40-35-115(b) lists the discretionary criteria for imposing consecutive sentencing. Because the criteria for determining consecutive sentencing "are stated in the alternative[,] . . . only one [criterion] need exist to support the appropriateness of consecutive sentencing." *State v. Mickens*, 123 S.W.3d 355, 394 (Tenn. Crim. App. 2003). If a trial court finds one of these grounds by a preponderance of the evidence, the trial court may "then choose whether, and to what degree, to impose consecutive sentencing based on the facts and circumstances of the case, bearing in mind the purposes and principles of sentencing." *State v. Perry*, 656 S.W.3d 116, 127 (Tenn. 2022).

The trial court herein noted that Tennessee Code Annotated section 40-35-115(b)(5) allows for consecutive sentencing if a defendant is convicted of two or more statutory offenses involving sexual abuse of a minor considering the aggravating circumstances. The trial court looked at the offense dates for each count, noting that the offenses spanned from October 1 to November 25. The trial court determined that the requirements were present to support consecutive sentencing and ordered Counts 2 and 3 to run consecutively to Count 1. The trial court ordered Counts 4 and 5 to run concurrently with each other but consecutively to Counts 2 and 3, for a total effective sentence of thirty years.

While a trial court is required to "specifically recite the reasons" for the imposition of consecutive sentences, *see* Tenn. R. Crim. P. 32(c)(1), the existence of a single category is sufficient. *State v. Adams*, 973 S.W.2d 224, 231 (Tenn. Crim. App. 1997). Defendant largely takes issue with the trial court's brief statements before ordering consecutive sentencing. However, as this Court has observed:

> [T]rial courts need not comprehensively articulate their findings concerning sentencing, nor must their reasoning be "particularly lengthy or detailed." *Bise*, 380 S.W.3d at 706. Instead, the trial court "should set forth enough to satisfy the appellate court that [it] has considered the parties' arguments and has a reasoned basis for exercising [its] own legal decision[-]making authority." *Id*.

*State v. Sheets*, No. M2022-00538-CCA-R3-CD, 2023 WL 2908652, at *4 (Tenn. Crim. App. Apr. 12, 2023) (alterations in original), *no perm. app. filed*. The record reflects that the trial court imposed a sentence that was consistent with the purposes and principles of sentencing, and Defendant has failed to establish that the trial court abused its discretion in imposing partial consecutive sentences.

### *Conclusion*

For the foregoing reasons, we affirm the judgments of the trial court in Counts 1- 4 and reverse for a new trial the judgment in Count 5.

s/Timothy L. Easter
TIMOTHY L. EASTER, JUDGE